# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**KEITH HAMER,**

    Plaintiff,

    v.                        Case No. 17-CV-1050

**ROEHL TRANSPORT INC.** and
**JOHN DOES 1-10,**

    Defendants.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS

    Keith Hamer worked as a truck driver for Roehl Transport, Inc. (Roehl), from April 2016 until April 2017. At the outset of his employment, Mr. Hamer entered into an agreement with Roehl whereby the company "loaned" him $5,000, the value of a training program required of new drivers. The agreement specified that Mr. Hamer would never have to repay the loan as long as he worked for Roehl and completed 120,000 paid solo miles. Roehl fired Mr. Hamer after he completed the training program but before he attained 120,000 miles, kept his last paycheck as a payment on the loan, and demanded that he pay the remaining balance.

    Mr. Hamer claims that, according to the terms of the agreement, he does not owe Roehl the balance of the loan. He filed suit in state court seeking a declaration to that effect; he also alleged that Roehl violated the Fair Labor Standards Act (FLSA) and breached the loan agreement. Roehl removed the matter to federal court and

counterclaimed for the balance of the loan. Mr. Hamer then amended his complaint to state violations of the FLSA's minimum-wage provision, violations of Wisconsin's minimum-wage law, and several common-law contract theories.

Roehl has moved to dismiss the contract-law claims for failure to state a claim upon which relief can be granted and for judgment on the pleadings as to his counterclaim. Mr. Hamer opposes both motions. For the reasons that follow, the Court finds that, as pled, the contract claims do not plausibly state a claim to relief and that Roehl is entitled to judgment as a matter of law on his counterclaim. The Court will therefore grant both of Roehl's motions.

I.  **Factual and Procedural Background**

Roehl Transport, Inc., is a Wisconsin corporation engaged in the hauling and delivery of freight across the United States. Amended Complaint Collective & Class Action Complaint ¶ 10, ECF No. 15. To ensure that its truck drivers were properly trained and licensed, Roehl required its new employees to enroll in its "Safety and Job Skills Training Program" (the Training Program). Am. Compl. ¶¶ 22, 24. Roehl valued the Training Program at $5,000 and extended new employees a credit to cover its cost. Am. Compl. ¶¶ 23–24.

In approximately April 2016, Keith Hamer enrolled in Roehl's Training Program. *See* Defendant's Counterclaim Against Keith Hamer ¶ 5, ECF No. 2 at 8–12. As part of his enrollment and participation in the Training Program, Mr. Hamer agreed in writing to the terms set forth in the "Agreement for the Value of the Safety

2

Case 2:17-cv-01050-DEJ   Filed 03/21/18   Page 2 of 19   Document 30

and Job Skills Training Program – Get Your CDL" (the Agreement). *See* Countercl. ¶ 6; *see also* Exhibit B to Am. Compl., ECF No. 15-2. He executed the Agreement on April 4, 2016. *See* Ex. B at 2.

The Agreement indicated that Mr. Hamer promised to repay Roehl the value of the Training Program, $5,000, which it had expended on his behalf. Ex. B at 1. It characterized the value of the Training Program as a loan that Mr. Hamer would "**never have to pay back as long as [he] work[ed] for [Roehl] as a driver and complete[d] 120,000 paid solo miles.**" *Id.* This arrangement was further memorialized in the promise-to-pay provision of the Agreement:

> By signing this agreement, you promise to repay to Roehl the value of the [Training Program] if you do not complete 120,000 paid solo miles. You are responsible for repayment if you voluntarily terminate your employment or you fail to maintain your driving qualifications other than your physical qualifications – [49 C.F.R. §] 391.41. If we ask you to leave the program because you lack the necessary skills and end your employment during CDL training or Phase 2 – on-the-job training we will not seek repayment and the debt goes away. **This debt goes away when you have completed 120,000 paid solo miles**.

*Id.*

Mr. Hamer completed the Training Program and began to accumulate paid solo driving miles. Countercl. ¶ 11. However, Roehl terminated his employment on April 14, 2017—before he completed 120,000 miles. *See* Countercl. ¶¶ 12–13. Thereafter, Roehl demanded repayment of the $5,000 loan and deducted Mr. Hamer's last paycheck, $891.58, as a partial payment toward that debt. Am. Compl. ¶¶ 35 & 37–40.

3

In July 2017, Mr. Hamer filed a small claims action against Roehl in Milwaukee County Circuit Court, alleging that Roehl violated the FLSA when it failed to pay him a minimum wage during his last pay period, that Roehl breached the Agreement when it terminated him before he was able to complete 120,000 paid solo miles, and that he was entitled to a declaration that no money was due to Roehl under the Agreement. *See* Summons and Complaint, ECF No. 1-1. Roehl removed the matter to federal court and filed an answer and counterclaim, alleging that Mr. Hamer breached the Agreement when he failed to timely pay the balance of the $5,000 loan. *See* Defendant's Answer, Defenses, and Counterclaim, ECF No. 2. The matter was randomly assigned to this Court, and the parties subsequently consented to magistrate judge jurisdiction. *See* Consent to Proceed Before a Magistrate Judge, ECF Nos. 5 & 7 (citing 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b)).

On November 15, 2017, Mr. Hamer filed an amended complaint on behalf of himself and two putative classes of former Roehl drivers. The Amended Complaint states five causes of action: (1) Violations of the FLSA; (2) Violations of the Wisconsin Minimum Wage Law; (3) Unjust Enrichment; (4) Breach of Implied Contract; and (5) Breach of Contract. *See* Am. Compl. ¶¶ 72–105. Mr. Hamer seeks an order designating this action as a collective action under 29 U.S.C. § 216(b) and certifying this action as a class action under Fed. R. Civ. P. 23. Am. Compl. pp. 16–17. He also seeks declaratory relief, unpaid wages, liquidated damages, costs, and fees.

On November 29, 2017, Roehl filed a motion to dismiss certain counts of the Amended Complaint and for judgment on the pleadings as to its Counterclaim. Defendant's Motion to Dismiss Counts III, IV, and V of Plaintiff's Amended Complaint and Motion for Judgment on the Pleadings as to Defendant's Counterclaim, ECF No. 17; *see also* Defendant's Brief in Support, ECF No. 18. Mr. Hamer filed his opposition to the motions on December 20, 2017. Plaintiff's Brief in Opposition, ECF No. 21. Roehl filed its reply brief on January 3, 2018. Defendant's Reply Brief, ECF No. 25. The matter is scheduled for jury trial on September 24, 2018. *See* Scheduling Order ¶ 11, ECF No. 13. The parties have agreed to mediation before United States Magistrate Judge William E. Duffin on May 22, 2018. *See* Amended Order Regarding Mediation Proceedings, ECF No. 29.

## II. Discussion

Roehl has moved to dismiss certain counts of the Amended Complaint and for judgment on the pleadings as to its Counterclaim. The Court will address each motion in turn.

### A. Roehl's Motion to Dismiss

Roehl seeks dismissal of Counts III, IV, and IV of the Amended Complaint under Fed. R. Civ. P. 12(b)(6).

#### 1. Legal standard

According to Fed. R. Civ. P. 8(a)(2), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is

5

entitled to relief." A Rule 12(b)(6) motion "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'" *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634–35 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim satisfies this pleading standard when its factual allegations 'raise a right to relief above the speculative level.'" *Zemeckis*, 679 F.3d at 635 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). When analyzing a motion to dismiss pursuant to Rule 12(b)(6), courts must "take the facts from the complaint, accept them as true, and draw reasonable inferences in favor of the plaintiff[]." *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 908 (7th Cir. 2013).

### 2. Counts III and IV

In Count III of the Amended Complaint, Mr. Hamer asserts that Roehl was unjustly enriched because it benefited from the time he (and other putative class members) spent driving for Roehl but failed to pay "at least minimum wage" for such time. *See* Am. Compl. ¶¶ 93–96. Similarly, Mr. Hamer asserts in Count IV that Roehl breached "an implied and implicit term" of its employment agreement because it failed to pay him (and other putative class members) "at least minimum wage for all compensable hours worked." *See* Am. Compl. ¶¶ 97–100.

6

Roehl argues that Counts III and IV are "entirely duplicative" of Mr. Hamer's minimum-wage claims (i.e., Counts I and II) and are therefore preempted by the FLSA. *See* Def.'s Br. 13–16. Mr. Hamer acknowledges that "a claim based on common-law contract theory is preempted by the FLSA to the extent it seeks the same relief available under the FLSA." Pl.'s Br. 17 (citing *Nicholson v. UTi Worldwide, Inc.*, Case No. 3:09-cv-722-JPG-DGW, 2010 U.S. Dist. LEXIS 138468, at *14–16 (S.D. Ill. Feb. 12, 2010)). He nevertheless argues that Counts III and IV are not preempted because those claims seek "'gap pay,' or pay that is contractually owed to the claimant that is not protected by the FLSA's mandated overtime-pay or minimum-wage protections." *See* Pl.'s Br. 17–18 (citing *Nicholson*, 2010 U.S. Dist. LEXIS 138468, at *5–6). Specifically, those Counts allege that Roehl failed to pay Mr. Hamer "*at least* the minimum wage." Pl.'s Br. 18 (citing Am. Compl. pp. 15–16).

As pled, Counts III and IV do not seek any relief beyond what is available under the FLSA. The Amended Complaint does not reference gap pay, and affixing the term "at least" to "minimum wage" does not provide adequate notice that Mr. Hamer is seeking such compensation. Gap pay " refers to compensation for hours worked (1) before the employee reaches the forty-hour per week overtime threshold, . . . and (2) at a rate that averages out to more than the applicable minimum wage." *Nicholson*, 2010 U.S. Dist. LEXIS 138468, at *15 (citation omitted). The Amended Complaint, however, does not allege that Roehl promised to pay Mr. Roehl any particular wage for the work he performed. *See Sanchez v. Haltz Constr., Inc.*, No. 09

C 7531, 2012 U.S. Dist. LEXIS 537, at *22–25 (N.D. Ill. Jan. 4, 2002) (finding unjust enrichment claim preempted by the FLSA where complaint did not "allege that the plaintiffs were promised any particular wage for the work that they performed"). Accordingly, Counts III and IV are preempted by the FLSA.

### 3. Count V

In Count V of the Amended Complaint, Mr. Hamer asserts that Roehl breached the Agreement by demanding that he (and other putative class members) repay the $5,000 loan after being discharged. *See* Am. Compl. ¶¶ 101–05. Roehl argues that Count V fails to state a claim for relief because Mr. "Hamer has not alleged that Roehl had an obligation to perform under the Agreement, that Roehl's performance was due, or that Roehl failed to perform." *See* Def.'s Br. 11–13; *see also* Def.'s Reply 11. The Court agrees. Roehl's obligation under the Agreement was simple: extend a $5,000 credit to Mr. Hamer for the value of the Training Program. Roehl indisputably fulfilled this obligation; no other performance was due. The Amended Complaint does not contain any allegations to the contrary.

Mr. Hamer does not appear to contest this interpretation. Instead, he argues that "[t]he Amended Complaint contains sufficient allegations to plead a plausible claim that Roehl breached the implied duty of good faith and fair dealing it owed Hamer under the [Agreement]." *See* Pl.'s Br. 15–17. According to Mr. Hamer, the Amended Complaint sufficiently alleges "that Roehl terminated Hamer to prevent [him] from attaining 120,000 paid solo miles." Pl.'s Br. 17. The Court disagrees.

8

Case 2:17-cv-01050-DEJ    Filed 03/21/18    Page 8 of 19    Document 30

Mr. Hamer does not allege anywhere in the Amended Complaint, let alone within Count V, that Roehl terminated him so that he would not reach the 120,000-mile benchmark. Nor can any such ill intent be inferred from the Amended Complaint's allegations. The Amended Complaint does not in any way suggest that Mr. Hamer was wrongfully discharged. Indeed, Mr. Hamer "admits that he was discharged . . . for mistakenly bypassing an open weigh station . . . and because he caused a service failure (when a driver is late for/with a pickup/delivery)." *See* Plaintiff's Answer and Affirmative Defenses to Defendant's Counterclaim ¶ 13, ECF No. 6.

Mr. Hamer's reliance on *Reimer v. Badger Wholesale Co., Inc.*, 433 N.W.2d 592 (Wis. Ct. App. 1988), is misplaced. In *Reimer*, the Wisconsin Court of Appeals upheld a jury verdict in favor of Dennis Reimer on his breach-of-contract claim against his former employer, Badger Wholesale. *See Reimer*, 433 N.W.2d at 593–94. The court determined that Mr. Reimer alleged and proved that Badger's failure to fulfill its pre-hiring promises "prevented him from doing his job to the expectations of himself and others." *Id.* at 594. In this case, however, Mr. Hamer has not alleged that Roehl breached any pre-hire promise to him. Rather, his failure to attain 120,000 paid solo miles resulted from his own misconduct. The Amended Complaint therefore does not plausibly state a claim for breach of the implied duty of good faith and fair dealing. Accordingly, the Court finds that Count V of the Amended Complaint does not state a claim to relief that is plausible on its face.

### B. Roehl's Motion for Judgment on the Pleadings

Roehl asserts that Mr. Hamer breached the Agreement by failing and refusing to repay the value of the Training Program. He seeks judgment on the pleadings as to this Counterclaim pursuant to Fed. R. Civ. P. 12(c).

#### 1. Legal standards

Courts "review Rule 12(c) motions by employing the same standard that applies when reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007)). As such, "[a] motion for judgment on the pleadings may be granted only if the moving party clearly establishes that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law." *Nat'l Fid. Life Ins. Co. v. Karaganis*, 811 F.2d 357, 358 (7th Cir. 1987) (citing *Flora v. Home Fed. Sav. & Loan Ass'n*, 685 F.2d 209, 211 (7th Cir. 1982)). "The court may consider only matters presented in the pleadings and must view the facts in the light most favorable to the nonmoving party." *Karaganis*, 811 F.2d at 358 (citing *Republic Steel Corp. v. Pa. Eng'g Corp.*, 785 F.2d 174, 177 n.2 (7th Cir. 1986)).

The material facts in this case are undisputed. The question is whether Roehl is entitled to judgment as a matter of law on its Counterclaim under the terms of the Agreement. The choice-of-law provision of the Agreement dictates that Wisconsin law governs the interpretation of this contract. *See* Ex. B at 2.

"The construction of a written contract is normally a matter of law for the court." *Levy v. Levy*, 388 N.W.2d 170, 172 (Wis. 1986) (citing *RTE Corp. v. Md. Cas. Co.*, 247 N.W.2d 171, 175 (Wis. 1976); *Pleasure Time, Inc. v. Kuss*, 254 N.W.2d 463, 467 (Wis. 1977)). Under Wisconsin law, "[t]he primary goal in contract interpretation is to give effect to the parties' intentions." *Seitzinger v. Cmty. Health Network*, 676 N.W.2d 426, 433 (Wis. 2004) (citing *Johnson Controls v. Emp'rs Ins. of Wausau*, 665 N.W.2d 257, 270 (Wis. 2003)). Reviewing courts "ascertain the parties' intentions by looking to the language of the contract itself." *Seitzinger*, 676 N.W.2d at 433 (citing *Journal/Sentinel, Inc. v. Pleva*, 456 N.W.2d 359, 362 (Wis. 1990)).

"Where the terms of a contract are clear and unambiguous, [courts] construe the contract according to its literal terms." *Tufail v. Midwest Hosp., LLC*, 833 N.W.2d 586, 592 (Wis. 2013) (citing *Md. Arms Ltd. P'ship v. Connell*, 786 N.W.2d 15, 20–21 (Wis. 2010)). "When the contract language is ambiguous, however, 'two further rules are applicable: (1) evidence extrinsic to the contract itself may be used to determine the parties' intent and (2) ambiguous contracts are interpreted against the drafter.'" *Md. Arms*, 786 N.W.2d at 21 (quoting *Seitzinger*, 676 N.W.2d at 433). "A contract provision is ambiguous if it is fairly susceptible of more than one construction." *Tufail*, 833 N.W.2d at 592 (quoting *Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 75 (Wis. 1996)).

"Contract language is construed according to its plain or ordinary meaning," *Tufail*, 833 N.W.2d at 592 (citing *Huml v. Vlazny*, 716 N.W.2d 807, 820 (Wis. 2006)),

11

"consistent with 'what a reasonable person would understand the words to mean under the circumstances,'" *Tufail*, 833 N.W.2d at 592 (quoting *Seitzinger*, 676 N.W.2d at 433)). Business contracts are construed consistent with what "would be understood by persons in the business to which the contract relates." *Tufail*, 833 N.W.2d at 600 (quoting *Columbia Propane, L.P. v. Wis. Gas Co.*, 661 N.W.2d 776, 783 (Wis. 2003)). Moreover, "the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Tempelis v. Aetna Cas. & Surety Co.*, 485 N.W.2d 217, 220 (Wis. 1992) (citing *Rosploch v. Alumatic Corp. of Am.*, 251 N.W.2d 838, 841 (Wis. 1977)). Finally, courts are wise to keep in mind Judge Hand's observation that "[t]here is no surer way to misread any document than to read it literally." *Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir. 1944) (Hand, J., concurring).

### 2. The parties' dispute

The parties here dispute the meaning of the Agreement's "Promise to Pay" provision:

> By signing this agreement, you promise to repay to Roehl the value of the [Training Program] if you do not complete 120,000 paid solo miles. You are responsible for repayment if you voluntarily terminate your employment or you fail to maintain your driving qualifications other than your physical qualifications – [49 C.F.R. §] 391.41. If we ask you to leave the program because you lack the necessary skills and end your employment during CDL training or Phase 2 – on-the-job training we will not seek repayment and the debt goes away. **This debt goes away when you have completed 120,000 paid solo miles**.

Ex. B at 1. The issue is relatively straightforward: Does the employee have to repay

12

the $5,000 loan if he is terminated after completing CDL training and Phase 2 but before he is able to attain 120,000 paid solo miles?

According to Roehl, the answer is unambiguously "yes." Roehl maintains that the plain language of the Agreement sets forth the general rule: Mr. Hamer promised to repay Roehl the value of the Training Program. The Agreement sets out only two exceptions to this general rule: the debt would go away if (1) Roehl asked Mr. Hamer to leave the Training Program and terminated him during CDL training or Phase 2 or (2) Mr. Hamer drove 120,000 paid solo miles. It is undisputed that Mr. Hamer was terminated after completing CDL training and Phase 2 but before reaching the 120,000-mile mark. Thus, neither exception applies, and we are left with the general rule: Mr. Hamer must repay the $5,000. *See* Def.'s Br. 5–11; Def.'s Reply 2–11.

Mr. Hamer, however, maintains that the answer is contextually ambiguous given the second sentence of the promise-to-pay provision. According to Mr. Hamer, the second sentence qualifies the 120,000-mile requirement: Mr. Hamer would be required to repay the loan only if, prior to reaching 120,000 miles, he (1) quit or (2) failed to maintain his driving qualifications. Mr. Hamer contends that a reasonable employee in his position would understand the second sentence to mean that he would not have to repay the loan if he were terminated before hitting the 120,000-mile mark. And, to the extent the Agreement is ambiguous, it should be construed against Roehl, the drafter. *See* Pl.'s Br. 5–15.

Roehl claims that the second sentence merely provides two specific examples of when the general rule applies. But that sentence does not reflect the *only* situations in which an employee would have to repay the loan. According to Roehl, the Agreement, when read as a whole, clearly demonstrates that the employee must repay the loan if he is terminated prior to completing 120,000 miles. Roehl further maintains that adopting Mr. Hamer's interpretation "would leave a gaping hole in the parties' deal." Def.'s Br. 10 (providing examples). Also, adopting Mr. Hamer's interpretation "would bring about an absurd interpretative result": Roehl could recoup the $5,000 if the employee voluntarily decided to leave the company prior to reaching 120,000 miles for whatever reason (e.g., relocation, health, or retirement) but not if the employee was involuntarily terminated for committing an egregious violation (e.g., failing multiple drug tests, causing a fatal accident, or stealing from the company) prior to attaining 120,000 miles. *See* Def.'s Br. 11.

Mr. Hamer counters that the second sentence does not contain any language suggesting that it merely provides a list of non-exhaustive examples. "Without such qualifying language, [the promise-to-pay provision] cannot be harmonized without rendering the entire second sentence . . . as mere surplusage." Pl.'s Br. 10–11. Moreover, Roehl's interpretation would also yield an absurd result: it could unilaterally decide to fire employees on the cusp of attaining 120,000 miles for any reason whatsoever (or no reason at all) and still demand repayment of the loan. *See* Pl.'s Br. 14–15.

### 3. Analysis

Despite the Agreement's expressed commitment "to be particular about using precise language to govern [the] financial relationship" between Roehl and Mr. Hamer, *see* Ex. B at 1, the promise-to-pay provision was not drafted with precision. Specifically, the second sentence of that provision creates ambiguity as to when Mr. Hamer was responsible for repayment. Each party has offered a fairly reasonable interpretation of the promise-to-pay provision. As such, a well-informed person likely would be confused as to what effect the second sentence has on the general promise to pay contained in the first sentence. *See Volkmann v. Superior Home Servs.*, 2002 WI App. 261, ¶6, 653 N.W.2d 772 ("The court must examine the contract's language itself to determine if well-informed persons should have become confused.").

The Court does not need to resort to extrinsic evidence to resolve this ambiguity. Rather, the Agreement as a whole demonstrates that the parties intended Mr. Hamer to be responsible for repaying the $5,000 in the event that he was terminated before completing 120,000 paid solo miles. Mr. Hamer's focus on a single sentence in isolation reflects a strained reading of the parties' intentions.

The Agreement clearly establishes 120,000 paid solo miles as a benchmark for the repayment obligation. The two-page contract references this benchmark six separate times:

1. "**The value of the program is in effect a loan to you. It's a loan you'll never have to pay back as long as you work for us as a driver and complete 120,000 paid solo miles.**"

15

2. "**Once you have completed 120,000 paid solo miles, this debt is completely forgiven and you owe us nothing for the [Training Program].**"

3. "By signing this agreement, you promise to repay to Roehl the value of the [Training Program] if you do not complete 120,000 paid solo miles."

4. "**This debt goes away when you have completed 120,000 paid solo miles**."

5. "And, you won't owe us anything if you complete 120,000 paid solo miles."

6. "Our agreement is simple – we'll teach you the skills needed to obtain a Class A Com[m]ercial Driver[']s Lice[]nse[] and to be a successful heavy duty truck driver at no cost to you as long as you work for us for 120,000 paid solo miles."

See Ex. B. A reasonable employee reading the Agreement would believe that he had to reach 120,000 miles before being relieved of the obligation to repay.

Mr. Hamer's reading of the promise-to-pay provision significantly and dramatically restricts the 120,000-mile requirement to two, specific scenarios that focus solely on the acts of the employee. That was not the bargain entered into by Roehl. By entering into the Agreement, Mr. Hamer received valuable training, and Roehl benefitted by having a qualified a truck driver. Roehl would receive little benefit if Mr. Hamer were to complete the Training Program but not maintain his employment with the company, whether through voluntary or involuntary separation. Hence the 120,000-mile benchmark.

Notwithstanding the clear intent of the parties, it is difficult to adopt Roehl's interpretation without rendering the second sentence of the promise-to-pay provision

16

as surplusage. "When possible, contract language should be construed to give meaning to every word, 'avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.'" *Md. Arms*, 786 N.W.2d at 25 (quoting *Kasten v. Doral Dental USA, LLC*, 733 N.W.2d 300, 315 (Wis. 2007)). To avoid such a result here, the Court construes the second sentence of the promise-to-pay provision as explaining two situations in which the general rule applies. It would have been better if the drafter, in this case Roehl, had used some qualifying language—e.g., "for example" or "including but not limited to." Better yet, the second sentence could be eliminated altogether. But its inclusion as written does not defeat the parties' clear intent, as evidenced by reading the contract as a whole.

Neither *Maryland Arms* nor *Johnson v. Green Bay Packers*, 74 N.W.2d 784 (Wis. 1956)—two cases relied upon by Mr. Hamer—compel a different result. In *Maryland Arms*, the Wisconsin Supreme Court determined that an unambiguous term of a residential lease was ambiguous when read in context of the lease as a whole because it provided a different answer to the same question than the sentence preceding it. *See Md. Arms*, 786 N.W.2d at 24–26. In this case, however, the second sentence of the promise-to-pay provision provides two examples of when the first sentence applies; it does not contradict it. Moreover, the Agreement as a whole resolves the ambiguity created by the inclusion of the second sentence.

In interpreting an arbitration agreement between the Green Bay Packers and one of its players from the Curly Lambeau era, the Wisconsin Supreme Court in

17

*Johnson* held that "general expressions will be restricted by particular descriptions or additions following them." *Johnson*, 74 N.W.2d at 790–91 (quoting 17 C.J.S., Contracts, § 313, p. 731). The court further explained, however, that "where the intent of the parties to employ a general term in its general sense is apparent from the contract as a whole, it will not be restricted in meaning by particular terms." *Id.* at 791. As explained in detail above, the Agreement as a whole shows the parties' general intent that Mr. Hamer was obligated to repay Roehl if he did not attain 120,000 miles. That intent is not restricted to the two particular circumstances provided in the second sentence of the promise-to-pay provision. Thus, *Johnson* actually supports Roehl's interpretation in this case.

In sum, the Court finds that the Agreement requires an employee to repay to the loan if he is terminated after completing CDL training and Phase 2 but before he is able to attain 120,000 paid solo miles. Mr. Hamer completed CDL training and Phase 2, but he was terminated before reaching the 120,000-mile mark. Mr. Hamer therefore breached the Agreement by failing and refusing to pay the balance of the $5,000 loan. Accordingly, Roehl is entitled to judgment as a matter of law on its Counterclaim.

### III. Conclusion

For all the foregoing reasons, the Court finds that Counts III and IV of the Amended Complaint are preempted by the FLSA, Count V does not plausibly state a breach-of-contract claim, and Roehl is entitled to judgment as a matter of law on his

Counterclaim. The Court will therefore grant Roehl's Motion to Dismiss and for Judgment on the Pleadings. Mr. Hamer may, however, file a second amended complaint that attempts to cure the deficiencies that plague Counts III and IV.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss Counts III, IV, and V of Plaintiff's Amended Complaint, ECF No. 17, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Judgment on the Pleadings as to Defendant's Counterclaim, ECF No. 17, is **GRANTED**.

**FINALLY, IT IS ORDERED** that Mr. Hamer has until **April 11, 2018**, to file a second amended complaint with respect to Counts III and IV only.

Dated at Milwaukee, Wisconsin, this 21st day of March, 2018.

BY THE COURT:

*s/ David E. Jones*
DAVID E. JONES
United States Magistrate Judge
